**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **CRIMINAL ACTION** |
| | : | |
| v. | : | **NO.  18-576-5** |
| | : | |
| VONTEZ SCALES | : | |

## <u>MEMORANDUM</u>

KEARNEY, J.                                                                                    May 13, 2020

   Following months of investigative efforts by the Drug Enforcement Administration, Bucks County Detectives, and Philadelphia police resulting in taped recordings, video surveillance, and pole camera photographs, our grand jury indicted several members of an organization trafficking methamphetamine, heroin, fentanyl, and cocaine operating out of Southwest Philadelphia.  Before trial, we held argument and evidentiary hearings on motions to suppress.  We granted two motions to suppress filed by accused co-conspirator Vontez Scales suppressing Mr. Scales's admissions following arrest.  All but one of the charged co-conspirators pleaded guilty before trial. We proceeded to trial against Mr. Scales. After evaluating extensive evidence including testimony from a charged co-conspirator, our jury found Mr. Scales guilty of conspiring to distribute controlled substances in the drug trafficking organization, possessing with intent to distribute heroin and fentanyl, and possessing 500 grams or more of methamphetamine.  It found him not guilty on the cocaine offense.

   Mr. Scales's trial counsel timely moved for a judgment of acquittal as a matter of law or a new trial.  Mr. Scales then discharged him. Through new privately retained counsel, he argues the jury lacked sufficient evidence to convict him of almost all the charged offenses.  He also argues his trial counsel provided ineffective assistance based on his, and the trial counsel's

former paralegal's, impressions of trial counsel's conduct outside of our presence.   After thorough review, we find sufficient evidence to sustain the jury's thoughtful verdict.  We also deny requested relief based on alleged ineffective assistance of trial counsel at this stage.

## I.     Evidence adduced at trial.

On November 13, 2019, our grand jury returned a second superseding indictment against Vontez Scales, Jarrett Cobb, Tyrone Smith, Rahim Amin, and Natasha Powell for conspiring with Damir Skipworth, John Richard Thornton, and Scott Martin to knowingly and intentionally distribute methamphetamine, heroin, fentanyl, and cocaine.[1]  Mr. Skipworth managed the drug trafficking organization which seemingly relied on several members sharing separate supply chains of methamphetamine, heroin, fentanyl, cocaine, and other controlled substances from inside and outside of this District.[2]  From April 2018 to December 11, 2018, the United States alleged this drug trafficking organization distributed more than 500 grams of methamphetamine, 100 grams of heroin, and 500 grams of cocaine.[3]  Managed by Mr. Skipworth but with several contributing members, the drug trafficking organization provided methamphetamine, heroin, and other controlled substances to each other including Mr. Scales.[4]  Members of the drug trafficking organization used cell phones to discuss and arrange drug transactions.[5]  Our grand jury charged several members of the drug trafficking organization, including Mr. Scales, with conspiring to distribute controlled substances; possessing with intent to distribute heroin, fentanyl, and cocaine; and possessing 500 grams or more of methamphetamine.[6]

Mr. Scales's privately retained trial counsel Eugene Tinari filed an omnibus pretrial motion, including moving to suppress his statements made in response to questioning at the Philadelphia Office of the Drug Enforcement Administration.[7]  We held an evidentiary hearing where one of the agents who questioned Mr. Scales testified and answered questions on cross-

examination from Attorney Tinari.[8]  We suppressed statements made in response to continued questioning after Mr. Scales validly invoked his right to silence.[9]  We denied the United States' motion to reconsider.[10]  After a second superseding indictment,[11] Mr. Scales moved to suppress statements made after arrest but before transport to the Philadelphia Office of the Drug Enforcement Administration.[12]  We held an evidentiary hearing and heard testimony from Detective Jarrod Eisenhauer.[13]  We suppressed Mr. Scales's statements made in response to custodial interrogation after agents placed him in custody but before they provided him the *Miranda* warnings.[14]  In the same Order, we denied Mr. Scales's untimely motion *in limine* to preclude cell phone records as the relevance of the cell phone records did not arise from new charges in the second superseding indictment and the United States' intended to introduce overwhelming corroborative evidence confirming Mr. Scales's involvement in the cell phone communications.[15]

Attorney Eugene Tinari represented Mr. Scales during the three-day jury trial. The jury heard testimony from seven witnesses, including alleged co-conspirator Scott Martin; Detective Jarrod Eisenhauer, a Bucks County Detective acting as the case agent on Mr. Scales's case; Investigator Gerald Loke, a senior financial investigator for the organized crime drug enforcement task force; and Special Agent Randy Updegraff of the Drug Enforcement Administration. The United States introduced communications intercepted by wiretap between Mr. Scales and Mr. Skipworth, as well as conversations between Mr. Skipworth and another alleged member of the drug trafficking organization, Zane Weeks, discussing Mr. Scales's conduct.  The United States also produced text and photo messages, attributed to Mr. Scales, of drugs and discussions of drug quantities.  Footage captured from a pole camera outside of Mr. Skipworth's house showed Mr. Scales's frequent visits, accompanied by contemporaneous calls

or texts alerting Mr. Skipworth of his arrival, and leaving twice with a bag or something heavy in his jacket pocket.

The jury convicted Mr. Scales on all counts except possession with intent to distribute cocaine.[16]

## II.    Analysis

Mr. Scales moves for judgment of acquittal under Rule 29 or, in the alternative, a new trial under Rule 33. Mr. Scales moves for acquittal on all counts, arguing insufficient evidence to support the jury's verdict.[17]

Federal Rule of Criminal Procedure 29 provides "[a]fter the government closes its evidence… the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."[18]  In considering a Rule 29 motion, we "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence."[19]  We "draw all reasonable inferences in favor of the jury's verdict," and a finding of insufficiency should "be confined to cases where the prosecution's failure is clear."[20]  "We do not reweigh evidence or assess witness credibility," and "we must sustain the verdict 'if a rational trier of fact could have found [the] defendant guilty beyond a reasonable doubt, and the verdict is supported by substantial evidence.'"[21]

Federal Rule of Criminal Procedure 33 provides: "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."[22] "Motions for a new trial based on the weight of the evidence are not favored… Such motions are to be granted sparingly and only in exceptional cases."[23]  Unlike a motion for acquittal under Rule 29, we weigh evidence and assess witness credibility in a motion for a new trial under Rule 33.[24]

But to set aside the verdict, the evidence must "preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand."[25]

### A.   The jury's conviction of conspiracy to distribute controlled substances is supported by substantial evidence.

Congress provides, "[a]ny person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."[26]  To establish a conspiracy under Section 846, the United States must prove "(1) a shared unity of purpose, (2) an intent to achieve a common illegal goal, and (3) an agreement to work toward that goal, which [Mr. Scales] knowingly joined."[27]

The United States charged Mr. Scales with conspiracy to distribute controlled substances under 21 U.S.C. § 841(a)(1), which makes it "unlawful for any person knowingly or intentionally… to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance."[28]

The United States can prove a conspiracy through direct or circumstantial evidence.[29] "We can infer such a conspiracy when evidence of related facts and circumstances make clear that the defendants could not have carried out their activities 'except as the result of a preconceived scheme or common understanding.'"[30]  But the United States need not prove Mr. Scales knew "all of the conspiracy's details, goals, or other participants."[31]  It need only introduce evidence Mr. Scales conspired with "someone-anyone."[32]  "Even an occasional supplier (and by implication an occasional buyer for redistribution) can be shown to be a member of the conspiracy by evidence, direct or inferential, of knowledge that she or he was part of a larger operation."[33]  The United States must produce sufficient evidence to show Mr. Scales joined the conspiracy, and was not in a mere "buyer-seller" relationship with suppliers.[34]

Our Court of Appeals in *United States v. Gibbs* directs us to evaluate the surrounding circumstances to determine membership in a conspiracy.[35]  The factors we may consider include: "the length of affiliation between the defendant and the conspiracy; whether there is an established method of payment; the extent to which transactions are standardized; and whether there is a demonstrated level of mutual trust."[36]  The transfer of large amounts of drugs and the delivery of drugs on credit also indicate a level of trust consistent with activities of co-conspirators.[37]  "Though no one of these factors alone will necessarily be sufficient—without more—to establish a mere buyer's agreement to join the conspiracy and his intent to achieve a common goal with that conspiracy, the presence of one or more of these factors furthers the inference that the buyer knew that he was part of a larger operation and hence can be held responsible as a co-conspirator."[38]

In *Gibbs*, our Court of Appeals affirmed the district court's holding sufficient evidence supported Mr. Sydnor's conspiracy conviction despite his allegation he merely bought drugs from a co-defendant member of the conspiracy.[39]  At trial, the United States introduced five tape-recorded conversations between Mr. Sydnor and his co-defendant, Mr. Gibbs, and introduced a piece of paper written by Mr. Gibbs including Mr. Sydnor's name on a list of people owing him money.[40]  Our Court of Appeals evaluated the taped conversations to determine Mr. Sydnor knew Mr. Gibbs "was working with other people on either end of the drug chain."[41]  The conversations evinced Mr. Sydnor's familiarity with Mr. Gibbs's dealings and the coded language of the drug trafficking organization.[42]  They also demonstrated repeated purchases and evidence Mr. Gibbs sold drugs to Mr. Sydnor on credit.[43]  Our Court of Appeals held this evidence sufficient to support the jury's conviction for conspiracy.[44]

Mr. Scales argues we should follow our Court of Appeals' reasoning in *United States v. Pressler* instead.[45]  In *Pressler*, our Court of Appeals vacated the district court's denial of Mr. Shreffler's motion for acquittal because the United States introduced no evidence proving he agreed to work with his sellers or buyers to achieve a common goal or advance a common interest, despite evidence Mr. Shreffler obtained and distributed controlled substances from someone he knew distributed drugs to other people.[46]  Our Court of Appeals distinguished *Gibbs*, where the defendant did not dispute a conspiracy existed but disputed he joined the conspiracy, because the United States in Mr. Shreffler's trial did not introduce sufficient evidence of an underlying conspiracy.[47]  Though the jury heard evidence of Mr. Shreffler's drug purchases from one particular distributor, they did not hear evidence of an underlying conspiracy.[48]  Because "all users and dealers get their drugs from someone else," repeated drug transactions with one distributor do not, alone, support a conviction for conspiracy.[49]  In *Gibbs*, multiple factors pointed toward the existence of a conspiracy. While the United States in *Pressler* introduced evidence proving Mr. Shreffler bought heroin from a distributor multiple times, it introduced no circumstantial evidence to establish an agreement among them to distribute heroin.

In Mr. Scales's case, the evidence shows a conspiracy led by Damir Skipworth existed and Mr. Scales knowingly joined that conspiracy. The United States introduced several recordings and text messages intercepted through wiretaps of conversations between Mr. Scales and a leader of the drug trafficking organization, Mr. Skipworth. In the calls and texts, Mr. Scales and Mr. Skipworth discuss meeting up to exchange drugs, drug weights, and drug pricing. Mr. Scales also acts as a middleman between his drug manufacturer and Mr. Skipworth, discussing heroin quality and pricing.

The jury heard evidence establishing on September 14, 2018, Mr. Scales and Mr. Skipworth exchanged calls arranging a meeting.[50] After Mr. Scales said he was "about to pull up,"[51] he arrived at Mr. Skipworth's residence in a black Chevy Tahoe, the type of car Mr. Scales rented that month.[52]  A pole camera captured both the Chevy Tahoe's arrival and Mr. Scales's approach to Mr. Skipworth's house.[53]  Mr. Scales left Mr. Skipworth's house with a bag in his hand.[54]  Shortly after leaving, Mr. Scales texted Mr. Skipworth, "Yo, bro, this shirt [sic] by 40."[55] A different phone number, ending in 3170, sent Mr. Skipworth a photograph of bags of a substance on a digital scale reading 409.9 grams.[56]  Detective Eisenhauer testified the substance looked like methamphetamine, and the bags were consistent with Mr. Skipworth's method of packaging methamphetamine.[57]  Mr. Scales called Mr. Skipworth to complain, explaining he would come back to procure the full pound of methamphetamine—450 grams[58]—because Mr. Skipworth gave him only 409.9 grams.[59]  Mr. Scales told Mr. Skipworth the one he gave him "was short by 40."[60]  The pole camera captured Mr. Scales returning to Mr. Skipworth's house.[61]  Mr. Skipworth exited his house with something in his hand.[62]  Detective Eisenhauer could not positively identify, from the pole camera footage, what was in Mr. Skipworth's hand.[63]

The jury also heard evidence from September 25 and 26, 2018.  On September 25, Mr. Skipworth called Mr. Scales and said he would give Mr. Scales "the 40 he owed him to make it even."[64]  They also argued about pricing: Mr. Skipworth wanted to charge $3,250 for a pound of methamphetamine, and Mr. Scales said, "Bro you been giving it to me for three bucks all this time."[65]  Detective Eisenhauer testified three bucks means 3,000.[66]  Mr. Skipworth responded: "Yeah and you been buying it bro. You didn't even buy this shit bro."[67]  On September 26, Mr. Skipworth called Mr. Scales and Mr. Scales said he would arrive in a minute.[68]  Pole cameras captured the black Chevy Tahoe and Mr. Scales arriving at Mr. Skipworth's house.[69]  A group of

people, including Zane Weeks and another person known to associate with the drug trafficking organization, stood outside Mr. Skipworth's home.[70]   At some point, Mr. Scales and Mr. Skipworth went inside the home.[71]   Mr. Scales exited the home and left in his Chevy Tahoe.[72] The pole camera showed Mr. Scales did not exit with anything in his hands.[73]

Finally, the United States introduced evidence from October 5 and 6, 2018. On October 5, the jury heard recordings and saw pole camera footage of a buyer, Stevie Newton, and an unknown male arrive at Mr. Skipworth's house.[74]   Mr. Skipworth and Mr. Scales texted about when Mr. Scales would arrive.[75]   The jury heard a recording of Mr. Scales telling Mr. Skipworth, "he said give him an hour to be done."[76]   When Mr. Skipworth asked about the quality of the heroin, Mr. Scales said it would be high quality:[77] "It's going to be, it's going to be what he wants – what they asking for, what they hollering for."[78]   Later that afternoon, Mr. Skipworth called Mr. Scales and told him Mr. Newton wanted 50 grams for $50 a gram, and "I want you to put a ten on for me," which Detective Eisenhauer testified means added 10 grams of a cutting agent to increase profit.[79]   Mr. Scales told Mr. Skipworth his supplier doesn't normally deal in such small amounts, but "they doing it because it's me."[80]   Mr. Skipworth responded, "I know, I know that…"[81]   The pole camera captured Mr. Scales's rental car, with a license plate matching his rental car records, arrive at Mr. Skipworth's, when Mr. Skipworth and the unidentified white male entered his car for ten minutes.[82]   The white male entered the car with nothing in his hands and exited with a sweatshirt in his hands.[83]   Detective Eisenhauer testified the unidentified male was a tester who tested the quality of the heroin in Mr. Scales's car.[84]   On October 6, Mr. Newton told Mr. Skipworth he had to take over driving for the unidentified male because he had a strong reaction to the substance he tested.[85]

The United States also introduced evidence of other members of the drug trafficking organization discussing Mr. Scales's role.  On October 6, 2018, Mr. Skipworth told Mr. Weeks he sold 9.5 pounds of the ten pounds of methamphetamine Mr. Weeks had supplied to him.[86]  On October 10, Mr. Skipworth and Mr. Scales discussed "half a pop," or half a pound of methamphetamine.[87]  On the same day, Mr. Weeks told Mr. Skipworth "Tez," or Vontez Scales, would pick something up for him ("He is going to give me mine").[88]  That night, Mr. Scales texted Mr. Skipworth "I am here" and the pole camera captured someone arrive and enter the adjacent residence, which Detective Eisenhauer testified might be used by an acquaintance of Mr. Skipworth.[89]  Detective Eisenhauer could not positively identify the person who arrived at Mr. Skipworth's house on October 10.[90]  The next day the pole camera captured Mr. Scales entering Mr. Skipworth's house.[91]  Mr. Scales exited the house with what Detective Eisenhauer interpreted as a "weighted item inside of his jacket."[92]

Applying the *Gibbs* factors, the evidence supports the jury's conviction of conspiracy to distribute controlled substances. The evidence confirms Mr. Scales's long-term affiliation with the conspiracy.[93]  Federal agents began intercepting communications on August 30, 2018.[94] They first heard Mr. Scales on the wiretap recordings on September 13.[95]  Mr. Scales argues this lag of fourteen days indicates a lack of connection to Mr. Skipworth.[96]  We disagree: The tone and substance of the intercepted conversation on September 14 arranging the pick up of methamphetamine suggests this drug transaction was not Mr. Scales's and Mr. Skipworth's first interaction. Mr. Scales's comment to Mr. Skipworth on September 25, "Bro you been giving it to me for three bucks all this time,"[97] evinces a series of methamphetamine transactions beginning before the first recorded interaction in September. Mr. Skipworth's response—"Yeah and you been buying it bro"[98]—establishes the longevity of their drug deals.

The September 25 conversation about pricing indicates standardized transactions—Mr. Scales had purchased each pound of methamphetamine for $3000, and Mr. Skipworth decided to increase the price to $3250. The conversation also evinces Mr. Scales and Mr. Skipworth had an established method of payment.[99] Mr. Skipworth's response, "Yeah and you been buying it bro. You didn't even buy this shit bro,"[100] suggests the transactions occasionally occurred on credit, demonstrating a level of trust consistent with activities of co-conspirators.[101]

The United States introduced evidence solidifying the high level of trust between Mr. Scales and Mr. Skipworth. After Mr. Scales complained about the "short" pound of methamphetamine on September 14, Mr. Skipworth promised him he would give him "the 40 he owed him to make it even."[102] Mr. Skipworth's proactive step to right his wrong suggests a desire to remain in good favor with Mr. Scales, or to maintain their mutually beneficial co-conspirator relationship.  On October 5, the evidence suggests Mr. Scales negotiated with his heroin manufacturer to facilitate the sale of 50 grams of heroin to Mr. Skipworth's client, Stevie Newton.[103]  Mr. Skipworth even asked Mr. Scales to place 10 grams of cutting agent in the heroin to increase Mr. Skipworth's profit.[104]  These interactions provide overwhelming evidence of Mr. Scales's shared unity of purpose and intent to achieve a common illegal goal with Mr. Skipworth.[105] Mr. Scales's interactions with other alleged members of the drug trafficking organization, including providing Mr. Weeks with drugs,[106] add further support to the jury's determination. All these factors indicate a level of trust consistent with activities of co-conspirators like in *Gibbs* as opposed to activities of the mere buyer-sellers in *Pressler*.

Mr. Scales's arguments challenging the sufficiency of the United States' evidence are unconvincing.[107]  Mr. Scales contends the United States' cooperating witness, Scott Martin, did not recognize him and federal agents never saw him at the Seafood House in Roxborough where

members of the drug trafficking organization would meet.[108]   The evidence showed Mr. Martin as a reliable buyer of methamphetamine from Mr. Skipworth.[109]   But Mr. Skipworth did not give Mr. Martin the wholesale lower cost of methamphetamine he charged Mr. Scales.[110]   The evidence does not suggest Mr. Martin occupied a trusted position in the drug trafficking organization such that his inability to recognize Mr. Scales indicates Mr. Scales did not join the conspiracy.   Lack of surveillance of Mr. Scales at the Seafood House does not negate the pole camera footage showing Mr. Scales visiting Mr. Skipworth's home multiple times.   The United States does not need to show Mr. Scales knew "all of the conspiracy's details, goals, or other participants."[111]

Mr. Scales also argues identification concerns provide reasonable doubt he used the cell phones the United States attributes to him. Mr. Scales argues the United States introduced insufficient evidence to prove Mr. Scales texted Mr. Skipworth the photograph of methamphetamine on a scale.[112]   Though the phone sending the photograph was not registered to Mr. Scales and Mr. Skipworth only received one text message from this number, the circumstantial evidence, including intercepted texts and calls from Mr. Scales's other phone number[113] and Mr. Scales's return to Mr. Skipworth's house,[114] suggests Mr. Scales sent the photograph.   Mr. Scales also contends the line sheet of the September 14th call listed Zane Weeks as a participant, while the United States identified the speaker as Mr. Scales.[115]   Detective Eisenhauer testified a software issue caused this error.[116]   Detective Eisenhauer swore, after speaking with Mr. Scales at the time of his arrest and re-listening to the tapes from the phone number, he, "without a doubt in his mind," believes Mr. Scales's voice is the voice behind the calls from that phone number.[117]   This evidence is sufficient to overcome the line sheet mistake on September 14, 2018.

Mr. Scales argues the lack of evidence of buyers besides Mr. Skipworth, and the fact federal agents never caught Mr. Scales with drugs, contradict the finding of conspiracy.  But the United States need not introduce evidence of drug transactions with more than one person to prove conspiracy to distribute controlled substances—it only needs to show Mr. Scales conspired with "someone-anyone."[118]   As we discussed, Mr. Scales's interactions with Mr. Skipworth demonstrate a level of trust consistent with activities of co-conspirators.  The lack of direct evidence establishing Mr. Scales possessed illicit substances does not affect our conspiracy analysis—instead, this argument is better suited for Mr. Scales's other challenges addressed below.

The United States introduced sufficient evidence to prove Mr. Scales had a shared unity of purpose and an intent to achieve a common illegal goal with Mr. Skipworth, and he knowingly joined the conspiracy in agreement to work toward that goal.[119]   Reviewing the record in the light most favorable to the United States, we conclude a rational trier of fact could have found Mr. Scales guilty beyond a reasonable doubt and substantial evidence supports the guilty verdict.[120]   We deny Mr. Scales's motion for acquittal for the conspiracy charge. We also conclude the evidence does not preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand.[121]   We deny Mr. Scales's motion in the alternative for a new trial.

**B.     The jury's conviction on possession with intent to distribute heroin and fentanyl is supported by substantial evidence.**

Congress provides: "[I]t shall be unlawful for any person knowingly or intentionally… to … possess with intent to manufacture, distribute, or dispense, a controlled substance."[122]   The United States must prove Mr. Scales "(1) knowingly possessed a controlled substance with (2)

the intent to distribute it."[123]   We evaluate each prong and conclude sufficient evidence supported the jury's conviction of Mr. Scales on possession with intent to distribute.

### i.   Evidence of Mr. Scales's knowing possession of a controlled substance

The United States first had to prove Mr. Scales "knowingly possessed a controlled substance."[124]   The parties do not dispute Mr. Scales did not actually possess the controlled substances when arrested.   We must determine whether sufficient evidence supported the jury's finding Mr. Scales had constructive possession of the drugs.

The United States may prove actual possession or constructive possession. "[C]onstructive possession requires an individual to have the power and intent to exercise both dominion and control over the object he or she is charged with possessing."[125]   "Such dominion and control need not be exclusive but may be shared with others."[126]   The United States can prove constructive possession through circumstantial evidence.[127]   Our Court of Appeals has found close physical proximity alone insufficient to prove constructive possession.[128]   "[S]imple ownership or control of a vehicle is not enough on its own to establish constructive possession of drugs found therein, but rather, additional evidence must link the defendant to the drugs."[129]

In *United States v. Martorano*, our Court of Appeals affirmed the district court's finding sufficient evidence supported Mr. Martorano's conviction for possession with intent to distribute controlled substances.[130]   Mr. Martorano handed payment to an undercover agent in exchange for the location and keys to a rental van containing drugs.[131]   Mr. Martorano handed his co-conspirator the keys to inspect the van, and during the co-conspirator's inspection of the van agents arrested Mr. Martorano.[132]   Our Court of Appeals held Mr. Martorano had dominion and control over the drugs in the van when he received the car keys in exchange for payment for the drugs.[133]

14

On March 26, 2019, Detective Eisenhauer arrived at Mr. Scales's apartment building to arrest him.[134]  Detective Eisenhauer and other officers entered the building and went to Mr. Scales's apartment door.[135]  As they stood by his door, Mr. Scales exited the elevator on his floor and an officer arrested him.[136]  They emptied Mr. Scales's pockets and found keys to an Acura car, over $10,000 in cash, Mr. Scales's driver's license, a credit card, and two cell phones.[137]  Detective Eisenhauer found the Acura matching the keys in the parking lot, parked in a spot close to Detective Eisenhauer's vehicle.[138]  That spot had been empty when Detective Eisenhauer arrived at the parking lot.[139]

On March 26, an unnamed task force officer drove the Acura to the Drug Enforcement Administration evidence warehouse in Philadelphia.[140]  Detective Eisenhauer determined Dazia Nixon owned the Acura and contacted her to pick it up, but she came to retrieve the car.[141]  Within the next month, an unnamed agent moved the Acura to the Bucks County evidence warehouse.[142]  Detective Eisenhauer received a search warrant and, on April 26, searched the Acura.[143]  The search discovered, in the driver's side map pocket, 295 green bags of a substance which lab tests revealed as a heroin fentanyl mix.[144]  The heroin fentanyl mix totaled 9.28 grams.[145]  A substance packaged in clear bags contained .92 grams of cocaine.[146]  The Acura's center console contained $295 in cash and a flip-style cell phone.[147]  Detective Eisenhauer found in the Acura a package addressed to Mr. Scales, including his address and the phone number attributed to Mr. Scales through wiretap interceptions.[148]  He also recovered two receipts, one from a clothing store and another from a car rental company, displaying Mr. Scales's name and phone number.[149]

Mr. Scales argues the evidence is insufficient to prove constructive possession. He contends the arrival of the Acura after the officers' arrival shows someone besides Mr. Scales

drove it to the parking lot, and that person—not Mr. Scales—exercised dominion and control over the drugs in the Acura.[150]  But officers arrested Mr. Scales as he came out of the elevator in his apartment building, suggesting he arrived to the building after the officers. They found the keys to the Acura in the search incident to arrest.  The search of the Acura revealed a package and receipts with Mr. Scales's name and phone number, indicating Mr. Scales used the vehicle. Circumstantial evidence supports the inference Mr. Scales drove the Acura to the parking lot outside his apartment building before his arrest.  Mr. Scales's argument the evidence shows someone else drove the car to the parking lot defies common sense.

Dazia Nixon's ownership of the Acura does not undermine the jury's conclusion Mr. Scales exercised dominion and control over the drugs in the Acura.  Even if the evidence suggested Ms. Nixon used the Acura, dominion and control need not be exclusive.[151]  In *Martorano*, our Court of Appeals held Mr. Martorano exercised dominion and control over the drugs in the rental van when he paid money for the drugs in exchange for the van keys.[152]  Here, Mr. Scales not only had the keys to the Acura containing the drugs, but also the timing of his arrival and the items belonging to him in the car provide sufficient evidence for the jury to conclude Mr. Scales knowingly possessed a controlled substance.

### ii.     Evidence of Mr. Scales's intent to distribute a controlled substance

The United States also had to prove Mr. Scales had "the intent to distribute [the controlled substance]."[153]   The United States can prove Mr. Scales's intent through circumstantial evidence.[154]   As we instructed the jury, "It's obviously impossible to prove directly the operation of Mr. Scales's mind. But a wise and intelligent consideration of all the facts and circumstances shown by the evidence and the exhibits in the case may enable you to infer Mr. Scales's state of mind."[155]   For example, our Court of Appeals instructs us large

16

amounts of drugs in individual packaging may provide evidence for a jury to infer a defendant's intent to distribute.[156]

When Detective Eisenhauer searched the Acura, he found 295 individual bags containing 9.28 grams of a heroin-fentanyl mixture.[157]   The United States introduced testimony from Special Agent Randy Updegraff, an expert in the field of narcotics and narcotics trafficking.[158] Special Agent Updegraff testified each of the bags contained a dosage unit of heroin or fentanyl, selling for ten dollars each.[159]  In addition to the bags' consistency with distribution amounts,[160] Special Agent Updegraff testified the bags were packaged in a manner consistent with distribution.[161]

Detective Eisenhauer also testified he found over $10,000 in cash in Mr. Scales's pockets when he arrested him.[162]   Special Agent Updegraff explained to the jury the typical mode of payment in drug sales is cash.[163]

Mr. Scales argues the United States introduced insufficient evidence of intent to distribute because officers found no drugs or drug paraphernalia in Mr. Scales's apartment when searched and officers did not directly observe Mr. Scales selling drugs in their investigation.  Our conclusion substantial evidence supported the jury's finding of constructive possession of the drugs in the Acura defeats these arguments. In addition, the United States introduced recordings of conversations between Mr. Scales and Mr. Skipworth in September and October of 2018 demonstrating Mr. Scales's involvement in the drug trafficking organization, providing additional circumstantial evidence Mr. Scales intended to distribute the drugs found in the Acura.

Mr. Scales challenges the accuracy of the United States' evidence introduced to prove Mr. Scales had excess money not attributable to his legitimate business, Bougie Extensions, LLC. Gerald Loke, a senior financial investigator for the organized crime drug enforcement task

force, testified Mr. Scales spent large amounts of money on rental cars and hotels.[164]  He also testified to the high percentage of cash deposits in his accounts, including his account for Bougie Extensions.[165]  Mr. Scales argues the evidence shows Investigator Loke had no experience with hair extension businesses and did not know how many people had access to the bank accounts.[166] Mr. Scales also contends Detective Eisenhauer conceded on cross-examination he did not know whether Mr. Scales's expensive Versace shirt was real or a knock-off.[167]  But Mr. Scales's arguments, even if we found them persuasive, would not undermine the evidence showing Mr. Scales had $10,000 in cash at his arrest. Mr. Scales does not offer an argument rebutting this evidence. Coupled with his constructive possession of 295 bags of heroin and fentanyl, the jury could readily find the large amount of cash is circumstantial evidence of drug transactions.

Mr. Scales's constructive possession of 295 individual bags of a heroin-fentanyl mixture, in addition to actual possession of $10,000 in cash and myriad evidence of his involvement with Mr. Skipworth's drug trafficking organization, provides sufficient evidence to support the jury's finding of Mr. Scales's intent to distribute. A rational trier of fact could have found Mr. Scales guilty of possession with intent to distribute controlled substances beyond a reasonable doubt,[168] and we deny Mr. Scales's motion for acquittal on his possession with intent to distribute conviction. We also deny his alternative motion for a new trial because the evidence does not preponderate heavily against the verdict and we would not miscarry justice by letting the verdict stand.[169]

### C.   The jury's conviction on possessing 500 grams or more of a mixture or substance containing methamphetamine is supported by substantial evidence.

The United States charged: "with respect to the conspiracy charged in this Count, 500 grams or more of a mixture and substance containing a detectable amount of

methamphetamine… is attributable, and was reasonably foreseeable, to [Mr. Scales] in violation of" 21 U.S.C. § 841(a)(1), (b)(1)(A).[170]   The jury had to calculate whether the drug amount equaled or exceeded 500 grams on the basis of Mr. Scales's "relevant conduct."[171]   Relevant conduct includes: (1) "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by" Mr. Scales; and (2) "all acts… of others that were – (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity…"[172]

"In determining the scope of the criminal activity [Mr. Scales] agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement), the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others."[173]   Mr. Scales "is accountable for all quantities of contraband with which he was directly involved and, in the case of a jointly undertaken criminal activity, all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook."[174]

We "may rely on intercepted drug conversations to estimate drug quantities."[175]   Though calculations of drug quantities may not be based on mere speculation,[176] "in calculating the amount of drugs involved in a particular operation, a degree of estimation is sometimes necessary."[177]   Our Court of Appeals recognizes the United States "usually cannot seize and measure all the drugs that flow through a large drug distribution conspiracy."[178]

Mr. Scales argues the United States did not present sufficient evidence to prove he possessed 500 or more grams of methamphetamine. Mr. Scales contends the United States' evidence is speculative because they never seized nor tested the alleged methamphetamine and identity concerns cast reasonable doubt on the identity of the person who texted the photograph

of 409.9 grams of methamphetamine.[179]  The United States responds the evidence fully supports the jury's reasonable attribution of 500 or more grams of methamphetamine to Mr. Scales.[180]

To calculate over 500 grams of methamphetamine reasonably attributable to Mr. Scales, the United States introduced evidence including the photograph weighing 409.9 grams; the forty grams Mr. Scales picks up to remedy the "short" pound; and the discussion of picking up "half a pop," or 225 grams, for Mr. Weeks.  The United States suggested in its closing Mr. Scales's recorded statement to Mr. Skipworth, "you been giving it to me for three bucks all this time,"[181] referred to a series of transactions between the co-conspirators selling each pound of methamphetamine for $3,000.[182]  Mr. Scales argues the United States invited the jury to merely speculate as to previous quantities of alleged drug transactions.[183]  Even without extrapolating past sales from this statement, or estimating quantities of drugs flowing through Mr. Skipworth's drug trafficking organization reasonably foreseeable to Mr. Scales, the United States introduced sufficient evidence for the jury's conclusion Mr. Scales possessed 500 or more grams of methamphetamine.

Sufficient evidence supported the jury's finding attributing 409.9 grams to Mr. Scales.  On September 14, 2018, Mr. Scales told Mr. Skipworth he was "about to pull up"[184] and the pole camera captured Mr. Scales's arrival in a black Chevy Tahoe, the type of car Mr. Scales rented that month.[185]  Mr. Scales left Mr. Skipworth's house with a bag in his hand.[186]  Shortly after leaving, Mr. Scales texted Mr. Skipworth, "Yo, bro, this shirt [sic] by 40."[187] A different phone number, ending in 3170, sent Mr. Skipworth a photograph of bags of a substance on a digital scale reading 409.9 grams.[188]  Federal agents only intercepted this one text message from this 3170 phone number, and that number is not registered to Mr. Scales.[189]  Detective Eisenhauer testified the appearance of the substance in the photograph was methamphetamine, consistent

with Mr. Skipworth's method of packaging methamphetamine.[190]   Mr. Scales called Mr. Skipworth to tell him he would return to procure the full pound of methamphetamine—450 grams—because Mr. Skipworth gave him only 409.9 grams.[191] Mr. Scales said the one he gave him "was short by 40."[192]   The pole camera captured Mr. Scales returning to Mr. Skipworth's house and Mr. Skipworth walking to the car with something in his hand.[193]   Mr. Scales's repeated phrase about the amount he received being "short by 40;" the photograph of a substance identical to methamphetamine weighing 409.9 grams—around 40 grams short of a pound, the measurement used for selling methamphetamine; Detective Eisenhauer's testimony the packaging in the photograph was consistent with Mr. Skipworth's method of packaging methamphetamine; and Mr. Scales's return to Mr. Skipworth's house provide sufficient evidence for the jury to conclude Mr. Scales texted the photograph and possessed 409.9 grams of methamphetamine.

Sufficient evidence also supported the jury's finding attributing an additional forty grams to Mr. Scales. When the black Chevy Tahoe returned to Mr. Skipworth's house on September 14, shortly after Mr. Scales texted he was pulling up,[194] Mr. Skipworth approached the vehicle with something in his hand.[195]   Detective Eisenhauer testified Mr. Skipworth handed the driver of the Chevy Tahoe something, but he could not see what.[196]   On September 25, Mr. Skipworth told Mr. Scales he would give him "the 40 he owed him to make it even."[197]   On September 26, Mr. Scales told Mr. Skipworth he would arrive in a minute.[198] Pole cameras captured Mr. Scales's black Chevy Tahoe arriving at Mr. Skipworth's house.[199]   Mr. Scales and Mr. Skipworth went inside the home.[200]   Mr. Scales exited the home and left in his Chevy Tahoe.[201]   Though Detective Eisenhauer did not see Mr. Scales leave with any noticeable package, he testified forty grams of methamphetamine would be the size of a golf ball.[202]   Considering Mr.

Skipworth's promise to provide Mr. Scales an addition forty grams of methamphetamine, and Mr. Scales's return to Mr. Skipworth's apartment the next day and later that month, the jury had sufficient evidence to attribute an additional forty grams of methamphetamine to Mr. Scales.

To reach 500 grams, the jury only needed sufficient evidence of fifty more grams of methamphetamine attributable to Mr. Scales. On October 6, 2018, Mr. Skipworth told Mr. Weeks he sold 9.5 pounds of the ten pounds of methamphetamine Mr. Weeks had supplied him.[203]  Mr. Skipworth told Mr. Weeks he had a half a pound of methamphetamine left.[204]  On October 10, Mr. Skipworth and Mr. Scales discussed "half a pop," or half a pound of methamphetamine, totaling around 225 grams.[205]  That same day, Mr. Weeks told Mr. Skipworth Mr. Scales would pick something up for him ("He is going to give me mine").[206]  That night, Mr. Scales texted Mr. Skipworth "I am here" and the pole camera captured someone arrive and enter residence next to Mr. Skipworth's house, which Detective Eisenhauer testified might be used by an acquaintance of Mr. Skipworth.[207]   On October 11, the pole camera captured Mr. Scales entering Mr. Skipworth's house.[208]  Mr. Scales exited the house with a "weighted item inside of his jacket."[209]   Detective Eisenhauer wrote in his affidavit Mr. Scales sold drugs to Mr. Skipworth on this date, but at trial Detective Eisenhauer corrected himself, explaining Mr. Skipworth sold methamphetamine to Mr. Scales.[210]  The conversations between Mr. Skipworth and Mr. Weeks and Mr. Skipworth and Mr. Scales support the inference Mr. Scales picked up 225 grams of methamphetamine from Mr. Skipworth, either on October 6 or 11, to deliver to Mr. Weeks.

Sufficient evidence supported the jury's attribution of 500 or more grams of methamphetamine to Mr. Scales.  Mr. Scales's contention federal agents never seized or tested these drugs is inapposite.[211]  As detailed above, myriad phone calls, pole camera footage, and

text messages support the conclusion Mr. Scales picked up quantities of methamphetamine totaling or surpassing 500 grams. The evidence also does not preponderate against the verdict requiring a new trial under Rule 33. We deny Mr. Scales's motions for acquittal and for a new trial for his conviction of possession of 500 or more grams of methamphetamine.

### D.      We deny Mr. Scales's ineffective assistance of counsel claim.

Defendants typically bring ineffective assistance of counsel claims in collateral proceedings under 28 U.S.C. § 2255 to ensure the factual record is fully developed.[212]  We do not entertain ineffective assistance of counsel claims under *Washington v. Strickland*[213] on direct appeal because "such claims frequently involve questions regarding conduct that occurred outside the purview of the district court and therefore can be resolved only after a factual development at an appropriate hearing."[214]

Our Court of Appeals established a "narrow exception" to the proper avenue of a collateral proceeding: "Where the record is sufficient to allow determination of ineffective assistance of counsel, an evidentiary hearing to develop the facts is not needed."[215]  But "[w]here a claim of ineffective assistance of counsel is based on attorney incompetence, the lack of a fully developed record often precludes a comprehensive inquiry into the elements of strategy or tactics that may have entered into defense counsel's challenged decision."[216]

Mr. Scales argues his previous counsel, Attorney Tinari, untimely moved to preclude evidence, which we struck as untimely, and his breakdown in attorney-client communication fell below an objective standard of reasonableness under *Strickland*.[217]  Mr. Scales argues his motion to preclude cell phone records from the number ending in 3170,[218] if filed in a timely manner, would have resulted in a favorable verdict. Mr. Scales also argues Attorney Tinari visited him only once or twice before trial, did not provide him the opportunity to review discovery, and

failed to address inconsistencies in the United States' evidence on cross examination. Mr. Scales attaches an affidavit from Haley Coolbaugh, Attorney Tinari's former paralegal, detailing her observations and her non-lawyer impressions of Attorney Tinari's alleged incompetence.[219]

We first disagree as to Mr. Scales's argument on the nature of our denial of his motion *in limine* to suppress cell phone records. Mr. Scales argues we denied his motion because of its timeliness in that these facts were known to him and his counsel long before the second superseding indictment. He is ignoring our November 25, 2019 Order which defined our reasons:

> We **deny** Defendant's Motion *in limine* (ECF Doc. No. 204) on cell phone records as untimely as the relevance of these cell phone records or cell phone photograph does not arise from new charges in the second superseding indictment (ECF Doc. No. 185) <u>and</u> as Defendant does not challenge the authenticity but instead challenges a witness's ability to identify the photograph and the United States intends to introduce corroborative evidence including surveillance video, witnesses familiar with Defendant's voice, and other evidence demonstrating Defendant used the particular phone on the challenged dates…[220]

Our November 25, 2019 Order defines our three reasons for denying the motion to suppress cell phone records. While untimely because Mr. Scales knew of the cell phone data before the deadline for motion filings, we still considered his arguments. We detailed substantive grounds for denying the motion based on Mr. Scales's decision to not challenge the authenticity and the United States intended to introduce corroborative evidence. Mr. Scales cannot credibly assert the timeliness of his motion, given the overwhelming evidence, affected the result reached by the jury. We similarly find no basis for ineffective assistance focused on Attorney Tinari's strategy in cross-examining witnesses or adducing evidence. The United States adduced overwhelming evidence of Mr. Scales's guilt on the most of the charges. Attorney Tinari did persuade the jury, notwithstanding the evidence, to find him not guilty on the cocaine charge.

Mr. Scales's remaining claim of ineffective assistance of counsel is based on two non-lawyer's views of attorney incompetence after the verdict. We saw no evidence of incompetence in the courtroom. Mr. Tinari filed and succeeded in suppressing evidence in a vigorously disputed motion following an evidentiary hearing. The present arguments relate to conduct outside of our presence. The lack of a fully developed record on direct appeal often precludes our complete evaluation of claims based on attorney incompetence. Paralegal Coolbaugh's affidavit does not provide us the fully developed record necessary to comprehensively evaluate Mr. Scales's *Strickland* claim. We deny Mr. Scales's ineffective assistance of counsel claim at this stage.

## III.    Conclusion

Because we find no basis to vacate the jury's verdict and conclude sufficient evidence supported Mr. Scales's conviction, we deny Mr. Scales's motion for acquittal under Rule 29. We deny Mr. Scales's motion for a new trial under Rule 33 because the evidence does not preponderate heavily against the verdict such that it would be a miscarriage of justice to let the verdict stand. We also deny Mr. Scales's ineffective assistance of counsel claim, which he may properly bring in collateral proceedings.

---

[1] ECF Doc. No. 185 at 2.

[2] *Id*. at 4.

[3] *Id*.

[4] *Id*.

[5] *Id*. at 5.

[6] *Id*. at 2, 15.

[7] ECF Doc. No. 130 at 8-9; ECF Doc. No. 151 at 2.

---

[8] ECF Doc. No. 142.

[9] ECF Doc. No. 151.

[10] ECF Doc. No. 197.

[11] ECF Doc. No. 185.

[12] ECF Doc. No. 202.

[13] ECF Doc. No. 229.

[14] ECF Doc. No. 238.

[15] ECF Doc. No. 239 at ¶ 1.

[16] ECF Doc. No. 261.

[17] ECF Doc. No. 362. On January 7, 2020, we held a status of counsel hearing and granted Mr. Scales's request to terminate the services of Attorney Tinari. ECF Doc. No. 287.  We appointed Attorney Margaret Grasso from the Criminal Justice Act Panel. *Id*.  On January 23, 2020, we held a second status of counsel hearing in response to Mr. Scales's *pro se* letter seeking to hire private counsel. ECF Doc. No. 296.  We dismissed Attorney Grasso and privately retained counsel Evan Hughes entered his appearance. ECF Doc. Nos. 294, 296. On April 14, 2020, Attorney Hughes supplemented the Attorney Tinari's motion for acquittal or, in the alternative, a new trial. ECF Doc. Nos. 316, 362.

[18] Fed. R. Crim. P. 29(a).

[19] *U.S. v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002) (quoting *U.S. v. Wolfe*, 245 F.3d 257, 262 (3d Cir. 2001)); *see also U.S. v. Salahuddin*, 765 F.3d 329, 348 (3d Cir. 2014).

[20] *Smith*, 294 F.3d at 476-477 (quoting *U.S. v. Anderskow*, 88 F.3d 245, 251 (3d Cir. 1996) and *U.S. v. Leon*, 739 F.2d 885, 891 (3d Cir. 1984)).

[21] *U.S. v. McKee*, 506 F.3d 225, 232 (3d Cir. 2007) (quoting *U.S. v. Coyle*, 63 F.3d 1239, 1243 (3d Cir. 1995)).

[22] Fed. R. Crim. P. 33(a).

[23] *U.S. v. Sims*, 382 Fed. App'x 178, 181 n. 4 (3d Cir. 2010) (quoting *Gov't of V.I. v. Derricks*, 810 F.2d 50, 55 (3d Cir.1987)).

[24] *U.S. v. Martinez*, 763 F.2d 1297, 1312 (11th Cir. 1985) (citing *U.S. v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)).

---

[25] *Id*. at 1313 (citing *U.S. v. Indelicato*, 611 F.2d 376, 387 (1st Cir. 1979) and *U.S. v. Sinclair*, 438 F.2d 50, 51 n.1 (5th Cir. 1971)).

[26] 21 U.S.C. § 846.

[27] *U.S. v. Claxton*, 685 F.3d 300, 305 (3d Cir. 2012) (quoting *U.S. v. Boria*, 592 F.3d 476, 481 (3d Cir. 2010)).

[28] 21 U.S.C. § 841(a)(1).

[29] *Boria*, 592 F.3d at 481.

[30] *U.S. v. Bailey*, 840 F.3d 99, 108 (3d Cir. 2016) (quoting *U.S. v. Kapp*, 781 F.2d 1008, 1010 (3d Cir. 1986)).

[31] *Id*. (quoting *U.S. v. Perez*, 280 F.3d 318, 343 (3d Cir. 2002)).

[32] *U.S. v. Pressler*, 256 F.3d 144, 149 (3d Cir. 2001) (quoting *U.S. v. Obialo*, 23 F.3d 69, 73 (3d Cir. 1994)).

[33] *U.S. v. Gibbs*, 190 F.3d 188, 198 (3d Cir. 1999) (quoting *U.S. v. Price*, 13 F.3d 711, 728 (3d Cir. 1994).

[34] *Bailey*, 840 F.3d at 108.

[35] *Gibbs*, 190 F.3d at 198.

[36] *Id*. at 199.

[37] *Id*. at 199-200.

[38] *Id*. at 200.

[39] *Id*. at 196.

[40] *Id*.

[41] *Id*. at 202.

[42] *Id*.

[43] *Id*.

[44] *Id*. at 203.

[45] *U.S. v. Pressler*, 256 F.3d 144 (3d Cir. 2001).

---

[46] *Id.* at 147.

[47] *Id.*

[48] *Id.* at 152.

[49] *Id.* at 153.

[50] N.T. Dec. 4, 2019 at 35:8-36:18.

[51] *Id.* at 36:11-18.

[52] *Id.* at 37:13-25.

[53] *Id.* at 37:5-38:24.

[54] *Id.* at 41:10-11.

[55] *Id.* at 31:23-32:5, 43:6-11.

[56] *Id.* at 44:10-46:23.

[57] *Id.* at 46:4-23, 51:7-14.

[58] *Id.* at 32:3-5.

[59] *Id.* at 50:10-13, 50:22-51:6.

[60] *Id.* at 31:17-19, 50:22-51:6.

[61] *Id.* at 51:15-21, 53:14-23.

[62] *Id.* at 53:21-54:1.

[63] *Id.* at 53:24-54:1.

[64] *Id.* at 62:21-25.

[65] *Id.* at 56:9-57:14; ECF Doc. No. 367 at 7-8. We quote from the United States' response because the parties elected not to include this audio recording played to the jury in the transcript and Mr. Scales did not contest the quotation accurately reflects the audio recording made available to him long before trial.

[66] N.T. Dec. 4, 2019 at 56:18-24.

---

[67] ECF Doc. No. 367 at 8. We quote from the United States' response because the parties elected not to include this audio recording played to the jury in the transcript and Mr. Scales did not contest the quotation accurately reflects the audio recording made available to him long before trial.

[68] N.T. Dec. 4, 2019 at 58:7-59:2.

[69] *Id*. at 60:12-23.

[70] *Id*. at 59:12-60:9.

[71] *Id*. at 61:4-8.

[72] *Id*. at 62:17-20.

[73] *Id*. at 63:2-4.

[74] *Id*. at 63:17-68:16.

[75] *Id*. at 68:17-71:7.

[76] ECF Doc. No. 367 at 8. We quote from the United States' response because the parties elected not to include this audio recording played to the jury in the transcript and Mr. Scales did not contest the quotation accurately reflects the audio recording made available to him long before trial.

[77] N.T. Dec. 4, 2019 at 242:4-22.

[78] ECF Doc. No. 367 at 8. We quote from the United States' response because the parties elected not to include this audio recording played to the jury in the transcript and Mr. Scales did not contest the quotation accurately reflects the audio recording made available to him long before trial.

[79] N.T. Dec. 4, 2019 at 74:6-23, 91:19-92:3.

[80] ECF Doc. No. 367 at 8. We quote from the United States' response because the parties elected not to include this audio recording played to the jury in the transcript and Mr. Scales did not contest the quotation accurately reflects the audio recording made available to him long before trial.

[81] *Id*. We quote from the United States' response because the parties elected not to include this audio recording played to the jury in the transcript and Mr. Scales did not contest the quotation accurately reflects the audio recording made available to him long before trial.

[82] N.T. Dec. 4, 2019 at 81:11-86:8.

[83] *Id*. at 86:7-20.

[84] *Id*. at 91:11-18.

[85] *Id*. at 92:9-16.

[86] *Id*. at 94:13-96:2.

[87] *Id*. at 96:3-24, 170:22-171:5.

[88] *Id*. at 96:25-97:19.

[89] *Id*. at 98:1-99:18.

[90] *Id*. at 98:23-99:7.

[91] *Id*. at 99:19-100:11, 103:1-3, 171:11-20.

[92] *Id*. at 103:4-15.

[93] *Gibbs*, 190 F.3d at 199.

[94] N.T. Dec. 4, 2019 at 155:9-14.

[95] *Id*. at 155:12-13.

[96] ECF Doc. No. 362 at 13.

[97] N.T. Dec. 4, 2019 at 56:9-57:14; ECF Doc. No. 367 at 7-8.

[98] ECF Doc. No. 367 at 8.

[99] *Gibbs*, 190 F.3d at 199.

[100] ECF Doc. No. 367 at 8.

[101] *Gibbs*, 190 F.3d at 199.

[102] N.T. Dec. 4, 2019 at 62:21-25.

[103] *Id*. at 74:6-23, 91:19-92:3.

[104] *Id*.

[105] *U.S. v. Claxton*, 685 F.3d 300, 305 (3d Cir. 2012) (quoting *U.S. v. Boria*, 592 F.3d 476, 481 (3d Cir. 2010)).

[106] N.T. Dec. 4, 2019 at 96:25-97:19.

[107] ECF Doc. No. 362 at 7-15.

[108] *Id*. at 12-13.

[109] N.T. Dec. 3, 2019 at 102:2-104:4

[110] *Id*.; N.T. Dec. 4, 2019 at 56:9-57:14.

[111] *U.S. v. Bailey*, 840 F.3d 99, 108 (3d Cir. 2016) (quoting *U.S. v. Perez*, 280 F.3d 318, 343 (3d Cir. 2002)).

[112] ECF Doc. No. 362 at 8-9.

[113] The phone number associated with most of Mr. Scales's intercepted calls and texts was registered to his brother. The United States introduced evidence associating the number with Mr. Scales. N.T. Dec. 4, 2019 at 13:15-14:14. For example, on September 14, 2018, the United States intercepted a call from that number saying he was pulling up, and then the pole camera captured Mr. Scales arriving. *Id*. at 36:11-37:21.

[114] *Id*. at 51:15-21, 53:14-23.

[115] ECF Doc. No. 362 at 14.

[116] N.T. Dec. 4, 2019 at 52:13-23.

[117] *Id*. at 109:1-17.

[118] *U.S. v. Pressler*, 256 F.3d 144, 149 (3d Cir. 2001) (quoting *U.S. v. Obialo*, 23 F.3d 69, 73 (3d Cir. 1994)).

[119] *U.S. v. Claxton*, 685 F.3d 300, 305 (3d Cir. 2012) (quoting *U.S. v. Boria*, 592 F.3d 476, 481 (3d Cir. 2010)).

[120] *U.S. v. McKee*, 506 F.3d 225, 232 (3d Cir. 2007) (quoting *U.S. v. Coyle*, 63 F.3d 1239, 1243 (3d Cir. 1995)).

[121] *U.S. v. Martinez*, 763 F.2d 1297, 1313 (11th Cir. 1985) (citing *U.S. v. Indelicato*, 611 F.2d 376, 387 (1st Cir. 1979).

[122] 21 U.S.C. § 841(a)(1).

[123] *U.S. v. Iglesias*, 535 F.3d 150, 156 (3d Cir. 2008) (quoting *U.S. v. Bobb*, 471 F.3d 491, 497 (3d Cir. 2006)).

[124] *Id.*

[125] *Id.* (quoting *U.S. v. Garth*, 188 F.3d 99, 112 (3d Cir. 1999)).

[126] *U.S. v. Introcaso*, 506 F.3d 260, 271 (3d Cir. 2007) (quoting *U.S. v. Davis*, 461 F.2d 1026, 1035 (3d Cir. 1972)).

[127] *Iglesias*, 535 F.3d at 156 (quoting *Bobb*, 471 F.3d at 497).

[128] *See, e.g., U.S. v. Jenkins*, 90 F.3d 814, 820 (3d Cir. 1996); *U.S. v. Brown*, 3 F.3d 673, 680 (3d Cir. 1993).

[129] *Brown*, 3 F.3d at 683.

[130] *U.S. v. Martorano*, 709 F.2d 863, 869 (3d Cir. 1983).

[131] *Id.* at 866.

[132] *Id.*

[133] *Id.* at 869.

[134] N.T. Dec. 4, 2019 at 104:9-17.

[135] *Id.* at 105:5-11.

[136] *Id.* at 105:12-25.

[137] *Id.* at 106:8-108:9.

[138] *Id.* at 110:1-18.

[139] *Id.*

[140] *Id.* at 125:4-19.

[141] *Id.* at 110:17-20, 111:7-12.

[142] *Id.* at 126:23-127:1.

[143] *Id.* at 111:13-17, 125:22-126:2.

[144] *Id.* at 112:12-115:4.

[145] *Id.* at 115:2-4.

[146] *Id.* at 115:5-9.

[147] *Id.* at 115:25-116:5.

[148] *Id.* at 116:8-117:9.

[149] *Id.* at 117:10-118:16.

[150] ECF Doc. No. 362 at 17.

[151] *U.S. v. Introcaso*, 506 F.3d 260, 271 (3d Cir. 2007) (quoting *U.S. v. Davis*, 461 F.2d 1026, 1035 (3d Cir. 1972)).

[152] *U.S. v. Martorano*, 709 F.2d 863, 869 (3d Cir. 1983).

[153] *U.S. v. Iglesias*, 535 F.3d 150, 156 (3d Cir. 2008) (quoting *U.S. v. Bobb*, 471 F.3d 491, 497 (3d Cir. 2006)).

[154] *U.S. v. Johnson*, 302 F.3d 139, 149 (3d Cir. 2002).

[155] N.T. Dec. 5, 2019 at 108:20-25.

[156] *Johnson*, 302 F.3d at 149-150.

[157] N.T. Dec. 4, 2019 at 112:12-115:4.

[158] *Id.* at 229:13-230:11.

[159] *Id.* at 252:7-253:4.

[160] *Id.* at 253:12-15.

[161] *Id.* at 253:6-11.

[162] *Id.* at 106:8-108:9.

[163] *Id.* at 253:16-22.

[164] *Id.* at 187:7-21, 206:11-21, 206:22-207:2.

[165] *Id.* at 191:12-192:25.

[166] ECF Doc. No. 362 at 19; N.T. Dec. 4, 2019 at 210:13-22, 215:17-22.

[167] ECF Doc. No. 362 at 20; N.T. Dec. 4, 2019 at 147:9-15.

[168] *U.S. v. McKee*, 506 F.3d 225, 232 (3d Cir. 2007) (quoting *U.S. v. Coyle*, 63 F.3d 1239, 1243 (3d Cir. 1995)).

[169] *U.S. v. Martinez*, 763 F.2d 1297, 1313 (11th Cir. 1985) (citing *U.S. v. Indelicato*, 611 F.2d 376, 387 (1st Cir. 1979).

[170] ECF Doc. No. 185 at ¶ 2.

[171] *U.S. v. Perez*, 280 F.3d 318, 352 (3d Cir. 2002).

[172] U.S. Sentencing Guidelines Manual § 1B1.3(a)(1)(A), (B).

[173] *Perez*, 280 F.3d at 353.

[174] *Id.*

[175] *U.S. v. Gibbs*, 190 F.3d 188, 203 (3d Cir. 1999).

[176] *U.S. v. Collado*, 975 F.2d 985, 998 (3d Cir. 1992).

[177] *Gibbs*, 190 F.3d at 203.

[178] *Collado*, 975 F.3d at 998.

[179] ECF Doc. No. 362 at 22.

[180] ECF Doc. No. 367 at 13.

[181] N.T. Dec. 4, 2019 at 56:9-57:14; ECF Doc. No. 367 at 7-8.

[182] N.T. Dec. 5, 2019 at 17:4-7.

[183] ECF Doc. No. 362 at 22.

[184] N.T. Dec. 4, 2019 at 36:11-18.

[185] *Id.* at 37:13-25.

[186] *Id.* at 41:10-11.

[187] *Id.* at 43:6-11.

[188] *Id.* at 44:10-46:23.

[189] *Id.* at 138:24-139:5, 140:23-141:13.

[190] *Id.* at 46:4-23, 51:7-14.

[191] *Id.* at 50:10-13.

[192] *Id.* at 31:17-19, 50:22-51:6.

[193] *Id.* at 51:15-21, 53:14-54:1.

[194] *Id.* at 152:21-24.

[195] *Id.* at 53:21-54:1.

[196] *Id.* at 152:15-20.

[197] *Id.* at 62:21-25.

[198] *Id.* at 58:7-59:2.

[199] *Id.* at 60:12-23.

[200] *Id.* at 61:4-8.

[201] *Id.* at 62:17-20.

[202] *Id.* at 63:2-12.

[203] *Id.* at 94:13-96:2.

[204] *Id.* at 95:12-13.

[205] *Id.* at 96:3-24, 170:22-171:5.

[206] *Id.* at 96:25-97:19.

[207] *Id.* at 98:1-99:18.

[208] *Id.* at 99:19-100:11, 103:1-3, 171:11-20.

[209] *Id.* at 103:4-15.

[210] *Id.* at 165:5-167:25.

[211] *See, e.g.*, *U.S. v. Gibbs*, 190 F.3d 188, 203 (3d Cir. 1999).

[212] *Massaro v. U.S.*, 538 U.S. 500, 504 (2003); *U.S. v. Headley*, 923 F.2d 1079, 1083 (3d Cir. 1991).

---

[213] *Washington v. Strickland*, 466 U.S. 668 (1984).

[214] *U.S. v. McLaughlin*, 386 F.3d 547, 555 (3d Cir. 2004) (quoting *Gov't of Virgin Islands v. Zepp*, 748 F.2d 125, 133 (3d Cir. 1984)).

[215] *Headley*, 923 F.2d at 1083.

[216] *McLaughlin*, 386 F.3d at 556.

[217] ECF Doc. No. 362 at 24.

[218] ECF Doc. No. 204.

[219] ECF Doc. No. 362-1.

[220] ECF Doc. No. 239 (emphasis in original).